| | | |
|---|---|---|
| STATE OF TENNESSEE, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-01040-STA-egb |
| | ) | |
| U.S. DEPARTMENT OF STATE, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TENNESSEE IMMIGRANT AND | ) | |
| REFUGEE RIGHTS COALITION, et al., | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING MOTION TO INTERVENE AS MOOT

Plaintiffs Tennessee General Assembly, in its own right and on behalf of the State of Tennessee, State Senator John Stevens, individually and in his official capacity, and State Representative Terri Lynn Weaver, individually and in her official capacity, have brought this action contending that federal laws requiring the State of Tennessee to provide Medicaid benefits to refugees, under threat of losing its federal Medicaid funding, coerce the State into subsidizing the federal Refugee Resettlement Program. Plaintiffs have sued the United States Department of State; Rex Tillerson, in his official capacity as Secretary of State; the Bureau of Population, Refugees, and Migration ("PRM"); Simon Henshaw, in his official capacity as Acting Assistant Secretary of State for the PRM; United States Department of Health and Human Services ("HHS'); Thomas E. Price, in his official capacity as Secretary of HHS; the Office of Refugee Resettlement ("ORR"); and Ken Tota, in his official capacity as Acting Director of ORR

(collectively the "Federal Government").  Plaintiffs seek a declaration that the challenged laws exceed Congress's authority under the United States Constitution's Spending Clause and violate the Tenth Amendment to the Constitution.  They also seek injunctive relief prohibiting further refugee resettlements in Tennessee until the Federal Government absorbs all costs of those resettlements.

Defendants have filed a motion to dismiss for lack of subject-matter jurisdiction or, in the alternative, for failure to state a claim upon which relief can be granted.  (ECF No. 24.) Plaintiffs have filed a response to the motion (ECF No. 38), Defendants have filed a reply to the response (ECF No. 39), and Plaintiffs have filed a sur-reply.[1]  (ECF No. 40.)  For the reasons set forth below, the motion to dismiss is **GRANTED**.

Tennessee Immigrant and Refugee Rights Coalition, on behalf of itself and its members, Bridge Refugee Services Inc., and Nashville International Center for Empowerment, has filed a motion to intervene on behalf of Defendants.  (ECF No. 25).  Because the Court grants Defendants' motion to dismiss, the motion to intervene is **DENIED** as moot.

## Background

Congress created the Medicaid program through enactment of Title XIX of the Social Security Act, Pub. No. L. 89-97, 79 Stat. 286, codified at 42 U.S.C. § 1396 *et seq*.  *See generally Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 650–51 (2003) (discussing the Medicaid program and its purpose).[2]  "Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so they may furnish

---

[1]  Plaintiffs also filed a notice of supplemental authority on November 22, 2017.  (ECF No. 44.)

[2]  As background for their motion, Defendants have described the Medicaid program, the administrative procedures associated with it, and various refugee programs relevant to this case. Plaintiffs have not disputed that this description is an accurate representation of the programs and procedures.  Therefore, the Court has summarized the information presented by Defendants.

medical care to needy individuals." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990) (citation omitted). *See also In re Estate of Trigg*, 368 S.W.3d 483, 499 (Tenn. 2012) ("The program is jointly funded by the federal government and the states, and each state operates its own program in accordance with federal requirements.").

Tennessee's participation in the Medicaid program began when the General Assembly enacted the Medical Assistance Act of 1968. *Roberts v. Sanders*, 2002 WL 256740 at *5 (Tenn. Ct. App. Feb. 22, 2002) (citing Act of Apr. 3, 1968, ch. 551, 1968 Tenn. Pub. Acts 496 (codified as amended at Tenn. Code Ann. §§ 71-5-101−119 (1995 & Supp. 2001))).[3] Participation in the program is voluntary, but participating states must comply with the requirements imposed by the statute and with regulations promulgated by the Secretary of HHS. *Wilder*, 496 U.S. at 502. *See also Roberts*, 2002 WL 256740 at *5 (While each state operates its own Medicaid program, each state must conform to federal requirements in order to receive federal matching funds.")

One of those requirements is that each state must have an approved plan that provides coverage for specified groups. 42 U.S.C. § 1396a(a)(10)(A)(i), (b); 42 C.F.R. § 430.10. That is, participating states must provide full Medicaid services under the approved state plan to groups of individuals who meet the eligibility criteria. *See Lewis v. Thompson*, 252 F.3d 567, 570 (2d Cir. 2001) ("States enjoy some flexibility in determining the breadth of a Medicaid plan, but are nonetheless cabined by a set of eligibility rules.")

Each state with an approved plan receives payments from the Federal Government according to a formula set out by statute. 42 U.S.C. § 1396d. If there is a determination that the state's plan or its administration of the plan no longer complies with Medicaid requirements, the

---

[3] In Tennessee, the Medicaid program is known as TennCare and is jointly funded by Tennessee and the Federal Government. (Compl. ¶ 34.)

Secretary will either withhold further payments to the state or may "limit payments to categories under or parts of the State plan not affected" by the non-compliance.  42 U.S.C. § 1396c.

A finding of non-compliance results in the following administrative process.  First an attempt is made by the HHS Centers for Medicare & Medicaid Services ("CMS") to resolve the matter informally. 42 C.F.R. §§ 430.32, 430.35.  If these efforts are unsuccessful, CMS initiates a formal compliance action by letter to the state which sets forth the finding of non-compliance, provides notice that some or all federal funding will be withheld absent compliance, and explains that the state has an opportunity for an evidentiary hearing before any payments will be withheld. 42 C.F.R. §§ 430.35(a) & (d), 430.70, 430.83–430.88.  If an adverse ruling is made, the state may seek review by the Administrator.  *Id.* §§ 430.80(a)(11), 430.102(b).  The Administrator's decision constitutes the final decision of the agency and is the earliest point at which federal funds can be withheld.  *Id.* §§ 430.102(c), 430.104(c).  A state may seek review of the final agency decision in the United States Court of Appeals for the circuit in which the state is located. 42 U.S.C. § 1316(a)(3); 42 C.F.R. § 430.38(a) - (b).  A similar administrative process allows a state to seek appellate-court review of CMS's disapproval of a proposed plan amendment.  42 U.S.C. § 1316(a).

The original Medicaid statute was "silent on the availability of Medicaid to aliens." *Lewis*, 252 F.3d at 571.  However, in 1973 the Secretary issued a rule requiring coverage of all lawful permanent residents and other aliens "permanently residing in the United States under color of law."  45 C.F.R. § 248.50 (1973).  The purpose of the 1973 rule was to implement the Supreme Court's decision in *Graham v. Richardson*, 403 U.S. 365, 376, 380 (1971), *see* 37 Fed. Reg. 11977 (June 16, 1972), in which the Court held that state laws denying welfare benefits to resident aliens violated the Equal Protection Clause of the Fourteenth Amendment and

impermissibly encroached upon exclusive federal power over the admission of aliens and the conditions of their residence.

In 1996 Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act, Pub. L. No. 104-193, 110 Stat. 2105 (1996), known as the Welfare Reform Act of 1996. In this Act, Congress announced a "national policy with respect to welfare and immigration." *Korab v. Fink*, 797 F.3d 572, 580 (9th Cir. 2014) (quoting 8 U.S.C. § 1601). The Act "establish[ed] a uniform federal structure for providing welfare benefits to distinct classes of aliens." *Id.* at 581. Reaffirming national policy that "aliens within the Nation's border [should] not depend on public resources to meet their needs," 8 U.S.C. § 1601(2)(A), the Act "impos[ed] sweeping restrictions on aliens' access to federally sponsored government aid" such as Medicaid. *Lewis*, 252 F.3d at 577–78; s*ee also Bruns v. Mayhew*, 750 F.3d 61, 63 (1st Cir. 2014) (citation omitted) ("For years, federal Medicaid extended medical assistance to eligible individuals without regard to citizenship status or durational residency. By act of Congress, however, the alien eligibility requirements for publicly-funded benefits, including Medicaid, changed dramatically in 1996.").

The Act separated aliens in the United States into two classes – qualified aliens who may be eligible for certain federally funded benefits and all other aliens who generally are not. 8 U.S.C. §§ 1611 - 1613, 1641. The definition of "qualified alien[s]" includes lawfully admitted refugees. 8 U.S.C. § 1641(b)(3). Five years following their entry into the United States, qualified aliens may be considered eligible for certain designated federal programs, including Medicaid; however, refugees are covered under Medicaid without regard to the five-year residency rule. *Id.* §§ 1612(b)(1), (2)(A)(i)(I)-(V), 1612(b)(3)(A)-(C), 1613(a), (b)(1). Medicaid coverage must be provided to eligible refugees for seven years following their admission to the United States, after which coverage of refugees becomes optional at the state's discretion. *Id.* §

1612(b)(1), (2)(A)(i).  If the refugee resettlement agency determines that a refugee is not eligible for Medicaid under the state plan, the agency looks to the Refugee Medical Assistance ("RMA") program for benefits for the refugee.  45 C.F.R. § 400.94(d).

Pursuant to its authority to regulate the "admission, naturalization, and residence of aliens in the United States or the several states," *Toll v. Moreno*, 458 U.S. 1, 11 (1982) (citation omitted), Congress enacted the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*, to establish a "comprehensive and complete code covering all aspects of admission of aliens to this country."  *Elkins v. Moreno*, 435 U.S. 647, 664 (1978).  Congress passed the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980), an amendment to the INA, which sets forth "a permanent and systematic procedure for the admission [of refugees] to this country" and "provide[s] comprehensive and uniform provisions for [their] effective resettlement."  *Id.* § 101(b).  The Act allows for the annual admission of refugees in "such number as the President determines . . . is justified by humanitarian concerns or is otherwise in the national interest." 8 U.S.C. § 1157(a)(2).  One year following their admission, refugees must apply for permanent-resident status, and they may apply for citizenship within five years.  *Id.* §§ 1159(a), 1427(a).

The Refugee Act also "provides for federal support of the refugee resettlement process," S. Rep. No. 96-256 at 2, authorizing the Federal Government to issue grants to and contract with state and local governments and private non-profit agencies to manage the initial admission and placement of refugees to the United States and provide subsequent resettlement assistance.  8 U.S.C. § 1522.  Pursuant to this authority, the PRM maintains and oversees the United States Refugee Admissions Program, a public-private partnership involving federal agencies, domestic non-profit organizations, and international organizations to screen, transport, and provide initial resettlement services for refugees.  *Id.* § 1522(b)(1), (7).

The PRM works with the non-profit organizations with which it has entered into cooperative agreements to determine where refugees will be resettled in the United States. Although the PRM consults with state and local governments "concerning the sponsorship process and the intended distribution of refugees among the States and localities before their placement," 8 U.S.C. § 1522(a)(2)(A), the Refugee Act does not provide for the involvement of state or local governments in determining where individual refugees are resettled once admitted to the United States. *See* H. R. Rep. No. 132, 99th Cong., 1st Sess., 19 (1985) (observing that the Act is "not intended to give States and localities any veto power over refugee placement decisions").

Under the Refugee Resettlement Program administered by the HHS Office of Refugee Resettlement ("ORR"), the Federal Government makes grants to and contracts with states and local and private non-profit agencies to assist refugees after their initial resettlement in achieving economic self-sufficiency. *See* 45 C.F.R. § 400.1(a), (b). States may receive grants for refugee assistance programs. 8 U.S.C. § 1522(e). ORR is authorized to reimburse a state for its costs of assisting refugees during their first three years of residence in the United States. *Id.* § 1522(e)(1). However, by the early 1990s, ORR no longer reimbursed the states for the full cost of providing cash and medical assistance to refugees due to an insufficiency of funds appropriated for that purpose. *See* 60 Fed. Reg. 33584, 33588 (June 28, 1995).

A state wishing to participate in the Refugee Resettlement Program must submit a plan, approved by ORR, describing how it will coordinate cash and medical assistance and other services to promote refugee resettlement and economic self-sufficiency. 8 U.S.C. § 1522(a)(6); 45 C.F.R. §§ 400.4(a), 400.5(b). A state may withdraw from the program with proper notice to ORR. 45 C.F.R § 400.301(a). However, the Refugee Act does not condition the resettlement of refugees in a state on that state's participation in the program. If a state chooses to withdraw

from the program, under the 1984 "Wilson/Fish Amendment" ORR may select one or more other grantees, usually private non-profit organizations, to administer federal funding for cash and medical assistance and social services provided to eligible refugee populations in that state. 8 U.S.C. § 1522(e)(7); 45 C.F.R. § 400.301(c); *see also* 69 Fed. Reg. 17692 (Apr. 5, 2004) (announcing availability of funding for applicants "to continue the provision of refugee program services and assistance … in a State when the State elects to discontinue participation" in the Refugee Resettlement Program). ORR currently funds thirteen Wilson/Fish programs operating in twelve states, including Tennessee.

By letter dated October 29, 2007, Tennessee withdrew from participation in the Refugee Resettlement Program effective June 30, 2008. (Compl. ¶ 32, ECF No. 1.) Subsequently, Catholic Charities of Tennessee, through its affiliate the Tennessee Office of Refugees, was designated to administer the Wilson/Fish program of refugee services and assistance in Tennessee. (*Id.* ¶¶ 38-39.)

**Background to the Complaint**

In 2016 the Tennessee General Assembly adopted Senate Joint Resolution 467 ("SJR 467") (Gilligan Decl. Exh. A, ECF No. 24-3) "regarding the commencement of legal action seeking relief … from the federal government's mandated appropriation of state revenue … with respect to refugee resettlement in Tennessee." SJR 467 at 1.[4] Reciting that requiring Tennessee to provide Medicaid benefits to eligible refugees or "risk losing all Medicaid funding" subjects the State to coercion in violation of the Tenth Amendment, the resolution calls on the Attorney General of Tennessee to initiate or intervene in litigation on the State's behalf to seek relief regarding "any actions taken by the federal government … prohibited by the Tenth

---

[4] There is some dispute as to whether this Resolution actually took effect. (Reply, p. 11, ECF No. 39.) However, for the purpose of deciding this motion, the Court will assume that it did, in fact, take effect.

Amendment." *Id.* at 1-3. Alternatively, the resolution authorizes the General Assembly "to employ outside counsel to commence a civil action" against the Federal Government if the Attorney General fails to do so. *Id.* at 4.

On July 5, 2016, the Tennessee Attorney General sent a letter to the General Assembly ("AG Letter") declining to bring suit against the Federal Government as requested by SJR 467. (Gilligan Decl. Exh. A, ECF No. 24-3.) The Attorney General explained that "extensive review of the legal issues raised by SJR 467" had led his office "to conclude that the 10th Amendment theories that underpin SJR 467 are unlikely to provide a viable basis for legal action," inasmuch as "[i]mmigration and refugee resettlement are matters largely reserved for federal jurisdiction." *Id.* at 1, 3. However, due to the General Assembly's "desire to resolve [its] concerns through the adjudicative process," for purposes of this matter the Attorney General delegated his authority to bring litigation on the State's behalf to staff counsel for the General Assembly "to the extent allowed by Tennessee law." *Id.* at 4. This lawsuit then ensued.

## Allegations of the Complaint

Plaintiffs allege that, by enacting and implementing provisions of the Refugee Act and the Welfare Reform Act, the Federal Government has unconstitutionally "coerc[ed] the state into subsidizing," and "commandeer[ed] state funds to finance" the Refugee Resettlement Program in Tennessee, thus "impermissibly intrud[ing] on Tennessee's state sovereignty." (Compl. ¶¶ 3, 4, 7.) Specifically, Plaintiffs contend that, following Tennessee's withdrawal from the Refugee Resettlement Program in 2008, (*id.* ¶ 32), the Federal Government, rather than discontinuing refugee resettlements in Tennessee, "bypassed" the State and appointed Catholic Charities of Tennessee to continue the resettlement program in Tennessee. (*Id.* ¶¶ 38-39.) Plaintiffs allege that, under the mandate to provide Medicaid benefits to otherwise eligible refugees located in the State, 8 U.S.C. § 1612, Tennessee must spend in excess of $30 million each year to fund the

Refugee Resettlement Program, (*id.* ¶ 29), despite its withdrawal from the program. (*Id.* ¶¶ 36, 37, 41.)

Plaintiffs further allege that "[i]f Tennessee refuses to expend state funds to provide these refugee services through Medicaid, the state is subject to a loss of nearly $7 billion" in federal Medicaid funds which amounts to "20% of its total state budget." (*Id.* ¶¶ 35, 42, 54.) According to Plaintiffs, by "threatening" Tennessee with this loss, the Federal Government has "coerced the state to continue funding the refugee resettlement program" and "thereby commandeered state funds to support a federal initiative." (*Id.* ¶ 33.) Additionally, the Federal Government's actions allegedly "deprive …Tennessee of its sovereignty," (*id.* ¶¶ 46, 56), in excess of Congress's power under the Spending Clause and in violation of the Tenth Amendment. (*Id.* ¶¶ 3, 48, 50, 51,59.)

According to Plaintiffs, the "refugee resettlement program also commandeers other state funds and instrumentalities through health and welfare programs and public schooling, including the program known as 'English Language Learners,' as mandated by 20 U.S.C. § 1703." (*Id.* ¶ 47.)

Plaintiffs seek declaratory relief and an injunction prohibiting resettlement of additional refugees in Tennessee unless and until the Federal Government pays for and absorbs the costs of the resettlement program "without any involuntary contribution" from the State. (*Id*., Prayer for Relief, ¶¶ 1-3.)

### Motion to Dismiss for Lack of Subject Matter Jurisdiction

A complaint may be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of jurisdiction. Under Rule 12(b)(1), a motion to dismiss "may either attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction." *Golden v. Gorno Bros.*, Inc., 410 F.3d 879, 881 (6th Cir. 2005). "A *facial* attack is a challenge to the

sufficiency of the pleading itself," and "the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994) (citation omitted). "A *factual* attack, on the other hand, is . . . a challenge to the factual existence of subject matter jurisdiction." *Id.* With a factual attack, "no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (citation omitted). The plaintiff bears the burden of proving that jurisdiction exists. *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) (explaining that, when "subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion").

"Proper jurisdiction is a requirement in determining the validity of a claim, and as such, Rule 12(b)(1) motions must be considered prior to any other challenges." *Lemke v. H&R Block Mortg. Corp.*, 2012 WL 715894 at *1 (E.D. Mich. Mar. 6, 2012) (citing *Bell v. Hood*, 327 U.S. 678 (1946)). *See also Moir*, 895 F.2d at 269 (quoting *Bell v. Hood* for the proposition that, when a defendant moves to dismiss under both Rule 12(b)(1) and (b)(6), the court should consider the 12(b)(1) motion first because "the 12(b)(6) challenge becomes moot if this court lacks subject matter jurisdiction.").

Because Defendants contend that this Court lacks subject matter jurisdiction over the complaint, the Court will first consider the request for relief under Rule 12(b)(1). Defendants specifically contend that this Court lacks subject-matter jurisdiction over Plaintiffs' claims for the following reasons: (1) Plaintiffs lack standing to bring their claim; (2) the claim is not ripe for review; and (3) review of Plaintiffs' claim in this Court is precluded by the Medicaid Act. The Court finds Defendants' contentions to be meritorious.

<u>Standing</u>

Defendants argue that neither the General Assembly nor the individual legislators have alleged that the State's duty to cover refugees under Medicaid inflicts concrete and particularized injuries on them as required to establish standing under Article III. Also according to Defendants, although the General Assembly asserts that it may sue on the State's behalf under a delegation of authority from the Attorney General, Tennessee law does not permit the Attorney General to delegate such authority to the General Assembly.

Article III of the United States Constitution endows federal courts with "[t]he judicial Power of the United States;" however, this power extends only to "cases" and "controversies." "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citation omitted). The standing requirement limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into "a vehicle for the vindication of the value interests of concerned bystanders." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982) (quoting *United States v. SCRAP*, 412 U.S. 669, 687 (1973)).

Because Tenth Amendment challenges "often involve controversial policy questions that courts are ill-equipped to handle and that put the courts at particular risk of encroaching on the proper domain of the political branches," before proceeding to the merits of a claim, it is "incumbent upon a federal court to ensure that a State asserting such a claim has alleged a 'particularized, concrete, and otherwise judicially cognizable' injury." *West Virginia v. United States Dep't of Health & Human Servs.*, 145 F. Supp. 3d 94, 110 (D.D.C. 2015), *aff'd sub nom. West Virginia ex rel. Morrisey v. U.S. Dep't of Health & Human Servs.*, 827 F.3d 81 (D.C. Cir. 2016).

As explained in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), as revised (May 24, 2016),

> Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood. The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong. In this way, "[t]he law of Article III standing ... serves to prevent the judicial process from being used to usurp the powers of the political branches," and confines the federal courts to a properly judicial role.

> Our cases have established that the "irreducible constitutional minimum" of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. [When], as here, a case is at the pleading stage, the plaintiff must "clearly ... allege facts demonstrating" each element.

*Spokeo,* 136 S. Ct. at 1547; *see also United States v. Hall*, 877 F.3d 676, 681 (6th Cir. 2017) (reiterating the requirements of Article III standing). A plaintiff must plead the elements of standing with specificity. *See Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (stating that a "plaintiff bears the burden of demonstrating standing and must plead its components with specificity"). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Injury in fact is the "[f]irst and foremost" of the three elements. *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998). To establish injury in fact, a plaintiff must show that he suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Id.* at 560 n.1. For an injury to be "concrete," it "must actually exist." *Spokeo,* 136 S. Ct. at 1548. For an

injury to be "actual or imminent," the "threatened injury must be certainly impending to constitute injury in fact" - "[a]llegations of possible future injury" are not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10 (2013) (citations omitted).[5]   The injury-in-fact requirement helps to ensure that the plaintiff has a "personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  Only one party to a lawsuit need have standing to satisfy Article III and survive a motion to dismiss.  *See Horne v. Flores*, 557 U.S. 433, 445–47 (2009) ("[T]he critical question is whether at least one petitioner has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.")

State Legislators

State Senator John Stevens and State Representative Terri Lynn Weaver have brought this action individually and in their official capacities as Tennessee elected officials.  According to the complaint, "[t]he actions of the federal government that give rise to this case impede and interfere with Senator Stevens's ability to fully discharge his duties as a member of the Tennessee General Assembly and as a leader on the Senate Standing Committee on Finance, Ways and Means," and  "[t]he actions of the federal government that give rise to this case impede and interfere with Representative Weaver's ability to fully discharge her duties as a member of the Tennessee General Assembly and as a leader and member of the committees on which she serves."  (Compl. ¶¶  8-9.)  Defendants maintain that Plaintiffs Stevens and Weaver lack standing both individually and in their official capacities, and the Court agrees.

---

[5]  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes - that the injury is certainly impending." *Lujan*, 504 U.S. at 565 n.2 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

As noted by Defendants, Plaintiffs' response does not address Defendants' argument that the complaint contains no allegations of personal injury to the legislators that would support their standing as individuals. Instead, Plaintiffs argue that the legislators have met the requirements of Article III because the General Assembly has standing and has designated them to act on its behalf. Accordingly, the Court finds that Plaintiffs have abandoned their individual capacity theory of standing, s*ee Montgomery v. Kraft Foods Glob., Inc.*, 2012 WL 6084167 at \*6 (W.D. Mich. Dec. 6, 2012), *aff'd*, 822 F.3d 304 (6th Cir. 2016) ("The Court also notes that Plaintiff failed to specifically respond to Defendants' arguments regarding subsection (h) in either of Plaintiff's briefs in opposition to the motions to dismiss, thereby effectively abandoning the claim."), and will address only their official capacity theory of standing.[6]

The Supreme Court examined legislator standing in *Raines v. Byrd*. In *Raines*, six members of Congress sued to invalidate the Line Item Veto Act, 2 U.S.C. §§ 691–692, on separation-of-powers grounds, arguing that the authority conferred by the Act on the President to cancel certain spending measures within appropriations bills rendered their votes on such legislation less effective. 521 U.S. at 814–16. In determining that the individual members of Congress did not have standing to bring suit, the Court explained that the harm described by the legislators was "a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally." *Id.* at 821. Having asserted an injury that was "wholly abstract and widely dispersed," the legislators "[did] not have a sufficient 'personal stake' in the dispute and [did] not allege[] a sufficiently concrete injury" and, therefore, failed to meet the requirements of Article III. *Id.* at 829–30. That is,

---

[6] In their sur-reply, Plaintiffs reference the declarations of Defendants Stevens (ECF No. 38-1) and Weaver (ECF No. 38-2) as supporting a finding that they have standing to sue as individuals. However, Plaintiffs have merely cited the declarations and have not explained how the declarations support their argument.

"[n]one of the plaintiffs … could tenably claim a 'personal stake' in the suit." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 (2015) (discussing *Raines*).

Less than two months after the decision in *Raines*, President William J. Clinton "exercised his authority to cancel one provision in the Balanced Budget Act of 1997, Pub.L. 105–33, 111 Stat. 251, 515, and two provisions in the Taxpayer Relief Act of 1997, Pub.L. 105-34, 111 Stat. 788, 895–896, 990–993." *Clinton v. City of New York*, 524 U.S. 417, 421 (1998). The constitutionality of the Line Item Veto Act was again challenged, but this time the Court held that the plaintiffs had standing to challenge of the Act. "Our disposition of the first challenge [in *Raines*] to the constitutionality of this Act demonstrates our recognition of the importance of respecting the constitutional limits on our jurisdiction, even when Congress has manifested an interest in obtaining our views as promptly as possible. But these cases differ from *Raines,* not only because the President's exercise of his cancellation authority has removed any concern about the ripeness of the dispute, but more importantly because the parties have alleged a 'personal stake' in having an actual injury redressed rather than an 'institutional injury' that is 'abstract and widely dispersed.'" *Id.* at 430 (citation omitted). The Court then found that "the cancellation procedures set forth in the Act violate[d] the Presentment Clause, Art. I, § 7, cl. 2, of the Constitution." *Id.* at 421.

Here, the alleged injury to Plaintiffs Stevens and Weaver in their official capacities is the type of non-personal harm that the Supreme Court rejected in *Raines*. Plaintiffs Stevens and Weave assert that Defendants' actions "impede and interfere" with their "ability to fully discharge [their] duties" as members of the General Assembly and of their respective legislative committees. (Compl. ¶¶ 8–9.) Such an injury is "wholly abstract," *Raines*, 521 U.S. at 825–26, 829, as it is based on the idea that compelled expenditures of state funds for the Refugee

Resettlement Program will interfere with their ability to appropriate state funds for other purposes and, therefore, dilute their legislative power. In arguing that Defendants' actions interfere with the work of the House Transportation Subcommittee (Compl. ¶ 9), which has no readily apparent nexus to the Refugee Resettlement Program, Plaintiffs implicitly acknowledge that "[t]he 'institutional injury' at issue . . . scarcely zeroe[s] in on any individual Member," *Arizona State Legislature*, 135 S. Ct. 2652, 2664 (2015), and, instead, is shared by all members of the General Assembly. Accordingly, because they lack a particularized injury in the dispute, Plaintiffs Stevens and Weaver have no standing in their official capacities to file suit in this matter.

Nor can Plaintiffs Stevens and Weaver file suit on behalf of the General Assembly because, as discussed below, the General Assembly itself lacks standing to file suit in this matter. State law confers upon the Attorney General the authority to initiate suit on behalf of the State or General Assembly. Senate Joint Resolution 467 does not give Plaintiffs the authority to file suit because a resolution cannot amend a statute or constitutional provision. *See*, *e.g.*, *Vertrees v. State Bd. of Elections*, 214 S.W. 737, 742 (Tenn. 1919);[7] Tennessee General Assembly, How A Bill Becomes A Law, http://www.capitol.tn.gov/about/billtolaw.html ("Resolutions differ from bills in that they do not become law but simply serve to express the views of the majority of one or both houses of the Legislature.") (last visited March 5, 2018). "The resolution, however, can be looked to as an expression of the opinion of the Legislature and as an expression of legislative advice." *Vertrees*, 214 S.W. at 742.

---

[7] In *Vertrees*, the Tennessee Supreme Court had under consideration the validity of Chapter 139, Pub. Acts of 1919, which conferred upon women the right to vote for electors for President and Vice President of the United States. The Act was sustained upon the ground that Tennessee's Constitution made no provision as to the manner of their election and hence the election of such officers could be "made in such manner as the Legislature shall direct." 214 S.W. at 739.

Neither can Plaintiffs rely on the letter from "Tennessee Attorney General Herbert H. Slatery, III, specifically delegating his constitutional and statutory authority to the General Assembly to commence litigation on behalf of the State of Tennessee and the General Assembly for the purpose of pursuing litigation challenging the constitutionality of the federal government's refugee resettlement program and other issues raised by SJR 467" (Compl. ¶ 6) as a basis for standing. In his letter, the Attorney General declined "to initiate a cause of action based upon untested, novel theories of coerced spending or commandeering of the budget process" and determined that "the 10th Amendment theories that underpin SJR 467 are unlikely to provide a viable basis for legal action." (Slatery Letter p. 3, ECF No. 38-7.) Although the letter purported to delegate the Attorney General's "authority to commence litigation on behalf of the State of Tennessee to staff counsel for the General Assembly for the limited purpose of pursuing litigation to address the issues raised in SJR 467," it did so only "to the extent allowed by Tennessee law." (*Id.* at p. 4.) Accordingly, the Court finds that Plaintiffs Stevens and Weaver have no standing to sue in either their individual or their official capacities.

<u>General Assembly On Behalf of Itself</u>

Defendants rely on *Arizona State Legislature v. Arizona Independent Redistricting Commission* in support of their argument that the General Assembly does not have standing to bring this lawsuit in its own right. *Arizona State Legislature* concerned a ballot initiative that purported to amend the state constitution to transfer congressional redistricting authority from the state legislature to a new independent commission. The state legislature brought suit against the commission, seeking to overturn the amendment as being in conflict with the Elections Clause, United States Constitution Article I. 135 S. Ct. at 2662. In considering the question of standing, the Supreme Court held that the legislature had adequately alleged an institutional injury because the ballot initiative "together with the Arizona Constitution's ban on efforts to

undermine the purposes of an initiative . . . would 'completely nullif[y]' any vote by the Legislature, now or 'in the future,' purporting to adopt a redistricting plan." 135 S. Ct. at 2665 (citing *Raines*, 521 U.S. at 823–24).

Plaintiffs contend that, under *Arizona State Legislature*, the General Assembly has standing because a majority of its members voted to authorize the lawsuit. However, *Arizona State Legislature* does not provide that authorization alone is sufficient to confer standing on the legislature. Instead, the Court's decision was based on an alleged complete loss of legislative power, as opposed to a mere dilution of that power. *Id.* at 2663–65. Here, the General Assembly alleges a deprivation "of [its] ability to spend state funds in the manner the people of Tennessee may . . . deem most appropriate." (Compl. ¶ 7.) Because this claim of injury acknowledges that the General Assembly still retains its appropriations authority, it is more akin to the "abstract dilution of institutional legislative power" described in *Raines*, 521 U.S. at 826, rather than the total loss of redistricting authority at issue in *Arizona State Legislature*.

Plaintiffs additionally argue that the injury at issue in this case is the General Assembly's right to appropriate state funds and that legislatures have standing to protect their "quasi-sovereign" interests when there is "coercive pressure" from the Federal Government involving the potential loss of federal funding. Although Plaintiffs are correct that the General Assembly has standing to protect itself from injury to its legislative authority under *Arizona State Legislature*, a legislature must establish that it has suffered a concrete and particularized injury, i.e., a complete loss of legislative power, in order to meet the requirements of Article III. Plaintiff General Assembly on behalf of itself has not satisfied that standard in that it has not alleged a complete loss of power to enact appropriations legislation. Instead, the allegation is that the preferred legislation, once enacted, might conflict with federal law.

<u>General Assembly on Behalf of the State of Tennessee</u>

The General Assembly also asserts standing to bring this lawsuit on behalf of the State under SJR 467 and the purported delegation of authority from the Tennessee Attorney General in his letter declining to file suit. Plaintiffs contend that, while the joint resolution was not necessary for it to bring this suit in the State's name, the enactment established a process for proceeding to litigation. Plaintiffs reason that, because the General Assembly is not before this Court invoking the name of the State to exercise executive power but, instead, is suing to remedy infringement upon its legislative powers, they may file suit on behalf of the State.

Defendants acknowledge that parties who lack standing in their own right may represent the State if state law authorizes them to "to speak for the State in federal court," *Hollingsworth v. Perry*, 570 U.S. 693, 710 (2013) (citing *Karcher v. May*, 484 U.S. 72, 81–82 (1987)), but argue that is not the case here. Instead, they contend that the Constitution and laws of Tennessee confer on the Attorney General – and not the Legislature – the authority to litigate on behalf of Tennessee.

Tenn. Code Ann. § 8-6-110 provides that "[t]he attorney general and reporter shall attend in person, or by assistant, and prosecute or defend . . . any and all suits . . . in which suit or suits the state may be a party, or in which the state has or may have interests of a pecuniary nature." Additionally, the General Assembly has listed as exclusive duties of the Attorney General "[t]he trial and direction of all civil litigated matters and administrative proceedings in which the state or any officer, department, agency, board, commission or instrumentality of the state may be interested." *Id.* § 8-6-109(b)(1); *see State v. Potter*, 61 S.W.3d 348, 351 (Tenn. Crim. App. 2001) (stating that the duties listed in § 8-6-109 are "the sole or exclusive authority" of the Attorney General).

The Attorney General may delegate his authority only if expressly permitted to do so by the State Constitution itself. *See* Tenn. Const. Art. II, §§ 1–2 (providing that "[t]he powers of the

government shall be divided into three distinct departments: legislative, executive, and judicial," and "[n]o person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted"); *see also State v. Armstrong*, 35 Tenn. 634, 653–54 (1856) (explaining that the Tennessee State Constitution "declares (article 2, § 1) that 'the powers of government shall be divided in the three distinct departments, the legislative, the executive, and judicial.' And sec. 2, that no one of these departments 'shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted.' Thus each department is limited within its own appropriate sphere."). Plaintiffs have pointed to no provision of the Tennessee Constitution that permits the delegation of the Attorney General's authority to represent the State in litigation. Thus, the Attorney General cannot delegate his constitutional authority to administer and enforce the law to a separate branch of government. *Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 453 (Tenn. 1995) (citations omitted) ("The Tennessee Constitution forbids an encroachment by one department upon the powers or functions of another.")

The Attorney General also cannot delegate his statutory authority. Any such delegation must be authorized by statute. *State ex rel. Comm'r of Transp. v. Med. Bird Black Bear White Eagle*, 63 S.W.3d 734, 772 (Tenn. Ct. App. 2001) ("The Attorney General is the chief executive officer of the Legal Department of state government. In this role, the Attorney General has both extensive statutory power and the broad common-law powers of the office except where these powers have been limited by statute.") Tennessee statutes provide one exception to this rule – when the Attorney General decides "not to defend the constitutionality and validity of any law," the Speakers of the Tennessee Senate and House of Representatives "acting jointly, may employ legal counsel to defend the constitutionality of such law." Tenn. Code Ann. § 8-6-109(c). This case does not present that situation. In the present case, the Attorney General has declined to

bring suit against the Federal Government rather than declining to defend the constitutionality of a law enacted by the General Assembly. *See generally Rich v. Tenn. Bd. of Med. Exam'rs*, 350 S.W.3d 919, 927 (Tenn. 2011) ("[H]ad the legislature intended to allow the additional exception asserted . . . it would have included specific language to that effect.").

Plaintiffs argue that the State's constitutional separation-of-powers principles are flexible enough to permit the General Assembly to litigate on the State's behalf. However, *Richardson v. Tennessee Board of Dentistry*, a case relied on by Plaintiffs, affirms the exclusive authority of each department in its respective sphere. 913 S.W.2d at 452-55 (holding that administrative agencies created by the legislature may not encroach upon the province of the judicial department by determining a statute's constitutionality (citing Tenn. Const. Art. II, §§ 1, 2)). The General Assembly, which is tasked "to make, alter, and repeal the law," may not attempt to "administer[] and enforce[] the law" as well. *Id.* at 453.

Senate Joint Resolution 467 cannot amend the constitutional or statutory responsibilities conferred upon the Attorney General. In the Attorney General's letter, the Attorney General delegated his litigation authority only "to the extent allowed by Tennessee law." AG Letter at 4. He cited no constitutional provision allowing such delegation, and Tennessee Code Ann. § 8-6-302, the sole statutory provision cited, is inapposite. That statute provides:

> The attorney general and reporter, exercising discretion and with the concurrence of the head of the executive agency involved, may permit, by express written authorization, staff attorneys employed by the various departments, agencies, boards, commissions or instrumentalities of the state to appear and represent the state in a certain case or certain classes of cases under the direction and control of the attorney general and reporter.

Tenn. Code Ann. § 8-6-302. This statute permits delegation of the Attorney General's authority only to an executive agency and only under the Attorney General's direction. Thus, the complaint fails to establish that any of the Plaintiffs have standing to bring this case.

Ripeness

Next, Defendants contend that Plaintiffs' claims are not ripe for review. The Medicaid Act allows the Secretary either to withhold federal funding entirely or in part when a state Medicaid program fails to comply with federal law. At the time of the filing of the complaint, Tennessee had not amended its Medicaid plan to deny coverage to refugees, and, therefore, HHS has not begun the administrative process to deny federal Medicaid funds to Tennessee. Accordingly, Defendants argue that whether Tennessee would suffer a loss of federal funds so great as to pass the point at which financial pressure becomes impermissible coercion depends on future events that may not occur. Plaintiffs have responded that the threat of enforcement of the Medicaid laws makes their claim ripe.

The ripeness doctrine arises "both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 57 n.18 (1993). "The ripeness doctrine not only depends on the finding of a case and controversy and hence jurisdiction under Article III, but it also requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances." *Brown v. Ferro Corp.*, 763 F.2d 798, 801 (6th Cir. 1985). The "basic rationale" of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . and also to protect [entities] from judicial interference until a[ ] . . . decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citations omitted); s*ee also Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506 (1972) (stating that the ripeness doctrine asks

whether "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment").

Ripeness is present when "an injury that has not yet occurred is sufficiently likely to happen to justify judicial intervention" or "when the court would be in no better position to adjudicate the issues in the future than it is now." *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010). A "future injury" will be deemed ripe if either "the injury is certainly impending" or "there is substantial risk that the harm will occur." *Susan B. Anthony List*, 134 S. Ct. at 2341; *see also Caprock Plains Fed. Bank Ass'n v. Farm Credit Admin.*, 843 F.2d 840, 845 (5th Cir. 1988) (concluding that "too many ifs" that render an injury a "mere potential[ity]," not just one or two that may render such a result into a substantial possibility or even a probability, will make a case unripe).

In evaluating a claim to determine whether it is ripe for judicial review, the court must consider "the fitness of the issues for judicial decision" and "the hardship of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003); *see also Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002) (explaining that, to determine whether a claim is ripe, a court must consider (1) the likelihood that the injury alleged by the plaintiff will ever occur; (2) whether the factual record is sufficiently developed to allow for adjudication; and (3) the hardship to the parties from refusing consideration). For pre-enforcement challenges, a case is ordinarily ripe for review "only if the probability of the future event occurring is substantial and of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Nat'l Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997). The ripeness doctrine acknowledges the problem inherent in adjudicating a dispute "anchored in future events that may not occur as anticipated, or at all." *Id.*

Here, Tennessee has not submitted a Medicaid plan amendment changing the provision of medical assistance to refugees. Nor have Plaintiffs alleged that Tennessee is currently withholding medical assistance from refugees. Because the State has taken no action to deny Medicaid benefits to refugees at the present time, the Federal Government has not considered the permissibility of any proposed changes in the State's provision of medical assistance to refugees or rendered a final decision and, *a fortiori*, there has been no judicial review of such a final decision. 42 U.S.C. §§ 1316(a), 1396c.

Additionally, there is nothing indicating that a finding of non-compliance would lead to the withholding of all of the State's federal Medicaid funding. CMS has discretion to withhold all or a limited portion of a State's Medicaid funds when the State's plan or the administration of the plan do not conform to federal requirements. 42 U.S.C. § 1396c; 42 C.F.R. § 430.35(d)(1). The injury that Plaintiffs claim, i.e., loss of all federal Medicaid funding, has not occurred and may never occur. Thus, Plaintiffs' claim "depends on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Warshak v. United States*, 532 F.3d 521, 526 (6th Cir. 2008) (citation omitted).

Plaintiffs assert that they face significant hardship given the possibility that Defendants could withhold up to $7 billion in Medicaid funds from Tennessee each year. However, that concern is speculative. Plaintiffs have not established that they face significant hardship if this Court finds that it does not have jurisdiction in light of the fact that the State has taken no action to deny Medicaid benefits to refugees and, therefore, no administrative proceedings against the State or withholding of funds for noncompliance have begun. *See Warshak*, 532 F.3d at 531−32 (explaining that "[h]ardship is difficult to maintain" when plaintiffs can avail themselves of "alternatives short of a pre-enforcement, facial attack on the enabling statute"); *see also New York v. U.S. Dept. of Health and Human Servs.*, 2008 WL 5211000 at *14 (S.D.N.Y. Dec. 15,

2008) (citing *Reno*, 509 U.S. at 58) ("requiring Plaintiffs to submit their plans through the plan amendment process before Plaintiffs challenge the process in court does not present the type of hardship or dilemma contemplated in *Abbott Laboratories*"); *White v. Snider*, 1994 WL 396415 at *3 (E.D. Pa. July 27, 1994) (emphasizing that the State had "not yet even received an adverse decision" and HHS had not disallowed federal funding or rejected an amendment to the State's plan). *See generally Magaw*, 132 F.3d at 284 (citation omitted) (noting that the ripeness doctrine prevents courts "from entangling themselves in abstract disagreements").

Plaintiffs also contend that hardship is shown by the fact that they have alleged a violation of the Tenth Amendment to the United States Constitution[8] and that a declaratory judgment would resolve any uncertainty faced by Plaintiffs in deciding how to proceed with providing (or not providing) Medicaid benefits to refugees within the State. Defendants have correctly pointed out that the Declaratory Judgment Act does not allow Plaintiffs to bypass the ripeness requirement.

"It is clear that the declaratory judgment procedure is available in the federal courts only in cases involving actual controversies and may not be used to obtain an advisory opinion in a controversy not yet arisen." *Marek v. Navient Corp.*, 2017 WL 32943 at *1 (N.D. Ohio Jan. 4, 2017) (quoting *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 116 (1947)). "The requirements of standing, ripeness, and mootness guard against the issuing of advisory opinions." *Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232 (6th Cir. 1985); *see also Briggs v. Ohio Elections Comm'n*, 61 F.3d 487, 493 (6th Cir. 1995) (noting that a court is "obliged under Article III to limit its jurisdiction to ripe cases, to avoid issuing advisory opinions based upon hypothetical situations.").

---

[8] The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Plaintiffs have taken no steps to deny Medicaid or any other benefits to refugees, and, thus, their request for a declaratory judgment is the type of "premature adjudication" that the ripeness doctrine is meant to avoid. *See Ky. Press Ass'n, Inc. v. Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006) (citations omitted) ("Ripeness is a justiciability doctrine designed to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements. Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all."). Accordingly, the Court finds that the action is not ripe for judicial review.

Preclusion

Next, Defendants contend that this Court's review of Plaintiffs' claim is precluded by the Medicaid Act because that Act provides an administrative process that culminates in appellate court review. In support of their argument, Defendants rely on *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), which provides that, when a statute provides for direct appellate review "of final agency actions, [courts] shall find that Congress has allocated initial review to an administrative body [when] such intent is 'fairly discernible in the statutory scheme.'" *Id.* at 207 (citation omitted). In that case, the Court held that a district court lacked authority to enjoin enforcement proceedings of the Mine Safety and Health Administration. The Court explained that the review structure established by the Mine Act, which provided for direct review of final agency action in the court of appeals, "demonstrate[d] that Congress intended to preclude challenges" — including constitutional challenges — prior to the completion of agency proceedings. *Id.* at 208, 215. Because the Mine Act provided a "detailed structure" for review of enforcement actions, even if the constitutional claim could not be addressed by the agency initially, it could be "meaningfully addressed in the Court of Appeals." *Id.* at 207, 215.

In the present case, as in *Thunder Basin*, the Medicaid Act sets out an administrative process pursuant to which the State may be heard regarding a withholding of payment for non-compliance. 42 U.S.C. §§ 1316, 1396c. If the State is aggrieved by the agency's decision, the State may petition for review in a federal court of appeals. 42 U.S.C. § 1316(a)(3).

Plaintiffs do not dispute that a plaintiff asserting a non-constitutional claim challenging a provision of the Medicaid Act would be precluded from litigating in district court. Instead, they argue that their claim is not precluded because the question presented to this Court is one of constitutional interpretation, i.e., whether the Federal Government's Medicaid requirements comply with the United States Constitution. According to Plaintiffs, § 1316 governs only the process for determining whether the State's Medicaid plan conforms to the requirements for approval under the Medicaid Act.

In *Elgin v. United States Department of the Treasury*, 567 U.S. 1 (2012), the Supreme Court looked at the question of whether district courts may hear constitutional challenges to statutes before an administrative body has ruled in the matter and determined that they may not. The *Elgin* plaintiffs were federal employees who were terminated because they failed to register for the Selective Service. *Id.* at 6. They filed suit challenging the constitutionality of the statute barring anyone failing to register for the Service from employment in an Executive Agency. *Id.* at 7. The District Court concluded that it had jurisdiction to hear the constitutional claims, even though the Civil Service Reform Act ("CSRA") provided an administrative process to challenge adverse employment actions, including an appeal to the Court of Appeals for the Federal Circuit, and the plaintiffs had not availed themselves of that process. *Id.* at 7–8. The Supreme Court stated the issue as whether "the CSRA provides the exclusive avenue to judicial review when a qualifying employee challenges an adverse employment action by arguing that a federal statute is unconstitutional." *Id.* at 5. The Court held that even employees bringing constitutional

challenges to federal statutes must do so within the judicial review framework established by that particular Act. *Id.* at 21–23.  In making its decision, the Court looked at its decision in *Thunder Basin* and determined "[l]ike the statute in *Thunder Basin*, the CSRA does not foreclose all judicial review of petitioners' constitutional claims, but merely directs that judicial review shall occur in the Federal Circuit." *Id.* at 10.  Likewise, the Medicaid Act provides for judicial review in the United States Court of Appeals for the circuit in which the state is located.

Because the Medicaid Act precludes review of Plaintiffs' claim in this Court, the Court lacks subject matter jurisdiction over Plaintiffs' claim that it is being coerced to provide Medicaid benefits to refugees.

In summary, the motion to dismiss for lack of subject matter jurisdiction is granted on the grounds of lack of standing and ripeness on Plaintiffs' claim that the Federal Government coerces it to expend significant sums of money to support the federal refugee program, including but not limited to the Medicaid program.  The motion to dismiss for lack of subject matter jurisdiction on the ground of preclusion is granted only as to any expenditures under the Medicaid program.

### Motion to Dismiss for Failure to State a Claim

In deciding a Rule 12(b)(6) motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, draw all reasonable inferences in favor of the plaintiff, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Determining whether a complaint states

a plausible claim for relief will [ultimately] . . . be a context-specific task that requires th[is Court] to draw on its judicial experience and common sense." *Id.* at 679.

Plaintiffs contend that provisions of the Welfare Reform Act of 1996 and the Refugee Act of 1980 exceed Congress's authority under the Spending Clause and violate the Tenth Amendment by compelling Tennessee to subsidize the Refugee Resettlement Program. According to Plaintiffs, federal requirements that Plaintiffs expend state funds to cover refugees through Medicaid and other programs interfere with Plaintiffs' right to appropriate state funds as they see fit. They argue that the Federal Government's ability to withhold Medicaid funding if the State refuses to expend funds to support refugee medical assistance is unconstitutional. Defendants have responded that Tennessee is not compelled to subsidize the Refugee Resettlement Program by financial inducement or otherwise and that the Refugee Act merely authorizes federally funded assistance and social services to refugees. They also assert that states have no authority under the Tenth Amendment to exclude refugees or deny them benefits because this would contravene national immigration policy as embodied by the Welfare Reform Act.

The Supreme Court discussed the difficulty of "ascertaining the constitutional line between federal and state power" in *New York v. United States*, 505 U.S. 144 (1992).

> At least as far back as *Martin v. Hunter's Lessee*, 1 Wheat. 304, 324, 4 L. Ed. 97 (1816), the Court has resolved questions "of great importance and delicacy" in determining whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States.
>
> These questions can be viewed in either of two ways. In some cases the Court has inquired whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I of the Constitution. *See, e.g., Perez v. United States*, 402 U.S. 146, 91 S. Ct. 1357, 28 L. Ed.2d 686 (1971); *McCulloch v. Maryland*, 4 Wheat. 316, 4 L. Ed. 579 (1819). In other cases the Court has sought to determine whether an Act of Congress invades the province of state sovereignty reserved by the Tenth Amendment. *See, e.g., Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S. Ct. 1005, 83 L. Ed.2d 1016 (1985); *Lane County*

> *v. Oregon*, 7 Wall. 71, 19 L. Ed. 101 (1869). In a case like these, involving the division of authority between federal and state governments, the two inquiries are mirror images of each other. If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress. *See United States v. Oregon*, 366 U.S. 643, 649, 81 S. Ct. 1278, 1281, 6 L. Ed.2d 575 (1961); *Case v. Bowles*, 327 U.S. 92, 102, 66 S. Ct. 438, 443, 90 L. Ed. 552 (1946); *Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 534, 61 S. Ct. 1050, 1063, 85 L. Ed. 1487 (1941).

*New York*, 505 U.S. at 155−56. Thus, "[t]he States unquestionably do retai[n] a significant measure of sovereign authority . . . to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." *Garcia*, 469 U.S. at 549. However, "the Supremacy Clause gives the Federal Government 'a decided advantage in th[e] delicate balance' the Constitution strikes between state and federal power." *New York*, 505 U.S. at 159 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

Article I of the United States Constitution contains the Spending Clause, pursuant to which Congress possesses the "Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. Art. I, § 8, cl. 1. As noted by Defendants, Congress has latitude under the Spending Clause "to further broad policy objectives by conditioning the receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206−07 (1987) (citation omitted). This includes the power to "fix the terms under which it disburses federal money to the States." *Suter v. Artist M*, 503 U.S. 347, 356 (1992) (citing *Pennhurst St. Sch. & Hosp. v. Halderman*, 451 U.S. 1, 15 (1981)); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius,* 567 U.S. 519, 576−77 (explaining that Congress may place conditions on states' receipt of federal funds "to create incentives for States to act in accordance with federal policies," without offense to the Tenth Amendment); *United States v. Am. Library*

*Ass'n, Inc.*, 539 U.S. 194, 203 (2003) (citation omitted) ("Congress has wide latitude to attach conditions to the receipt of federal assistance in order to further its policy objectives."). The choice "between accepting the money and the conditions, or declining both" may be a "hard one," *Kansas v. United States*, 214 F.3d 1196, 1203−04 (10th Cir. 2000), but states may resort to "the simple expedient of not yielding to federal blandishments when they do not want to embrace the federal policies as their own." *Nat'l Fed*, 132 S. Ct. at 2603. *See also Pennhurst St. Sch. & Hosp.*, 451 U.S. at 17 (likening Spending Clause legislation to a "contract" whereby "in return for federal funds, the States agree to comply with federally imposed conditions").

In upholding statutes in which Congress has attached strings to the receipt of federal grants, the Supreme Court has recognized limitations to Congress's power under the Spending Clause. They include: (1) the exercise of the spending power must be in pursuit of the general welfare; (2) conditions on the receipt of federal funds must be unambiguous; (3) conditions must be related to the federal interest in a particular national project or program; and (4) the legislation cannot induce the states to engage in activities that would be unconstitutional. *Dole*, 483 U.S. at 207–08 (permitting federal law conditioning receipt of highway construction funds on states' raising minimum drinking age). Additionally, "the financial inducement offered" may not be "so coercive as to pass the point at which 'pressure turns into compulsion.'" *Id.* at 211 (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937) (equating impermissible "coercion" with "destroying or impairing the autonomy of the states").

In the present case, Plaintiffs seek a declaration that, due to Tennessee's withdrawal from the Refugee Resettlement Program, the State should no longer be required to accept refugees for resettlement and/or be forced to expend State funds to cover the cost of the health-care services the refugees receive under Medicaid. According to Plaintiffs, the Federal Government's implementation of the Refugee Act, 8 U.S.C. § 1522, and the Welfare Reform Act, 8 U.S.C. §

1612, impermissibly intrudes on Tennessee's sovereignty. Plaintiffs contend that the Federal Government's actions violate the Tenth Amendment by "commandeering" State funds and "coercing" the State to expend funds to provide benefits to refugees. (Compl. ¶¶ 1, 18, 23.) Defendants have responded that the states have no reservoir of authority under the Tenth Amendment to exclude refugees or to deny refugees Medicaid benefits in contravention of the national immigration policy embodied by the Welfare Reform Act.

It is undisputed that "[t]he authority to control immigration … is vested solely in the Federal government" by the Naturalization Clause of Article I of the United States Constitution. *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 416 (1948). Courts "have long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders." *Toll*, 458 U.S. at 10 (citing *Mathews v. Diaz*, 426 U.S. 67 (1976); *Graham*, 403 U.S. at 377–380; *Takahashi*, 334 U.S. at 418–20; *Hines v. Davidowitz*, 312 U.S. 52, 62 - 68 (1941); *Truax v. Raich*, 239 U.S. 33, 42 (1915)). "The Government's broad authority over immigration was first announced more than one-hundred years ago in *The Chinese Exclusion Case*, 130 U.S. 581, 9 S. Ct. 623, 32 L. Ed. 1068 (1889)." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 685 (6th Cir. 2002); *see also Arizona v. United States*, 567 U.S. 387, 394 (2012) (citing *Toll*, 458 U.S. at 10) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("[O]ver no conceivable subject is the legislative power of Congress more complete.").

The Federal Government not only has the authority to establish the conditions for aliens' admission to the United States but also "extensive powers to regulate . . . the conditions under which [they] remain . . . ." *Korab*, 797 F.3d at 580. "When the national government by … statute has established rules and regulations touching the rights, privileges, obligations, or burdens of aliens as such . . . "[n]o state can add to or take from [its] force and effect." *Hines*,

312 U.S. at 62–63. Accordingly, the states "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states." *Toll*, 458 U.S. at 11 (citation omitted).

In *Graham v. Richardson*, the Supreme Court was faced with the issue of whether a state could favor United States citizens over aliens in the distribution of welfare benefits.[9] In holding that the state statutes at issue denying welfare benefits to resident aliens who had not resided in the United States for a specific number of years violated the Equal Protection Clause, the Court explained that "justification of limiting expenses is particularly inappropriate and unreasonable when the discriminated class consists of aliens. Aliens like citizens pay taxes and may be called into the armed forces . . . . [A]liens may live within a state for many years, work in the state and contribute to the economic growth of the state."[10] *Id.* at 376–80. The Court concluded that the state statutes were "constitutionally impermissible" because they conflicted with federal policy, declared by Congress, regarding the admission of aliens and their right to the full and equal benefit of state laws. In so doing, the states "encroached upon exclusive federal power." *Id.* at 376-80. "[When] the federal government, in the exercise of its superior authority in [the immigration] field, has enacted a complete scheme of regulation … states cannot … conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." *Id.* at 378 (citation omitted).

The *Graham* Court pointed out that, "[u]nder Art. I, § 8, cl. 4, of the Constitution, Congress' power is to 'establish an uniform Rule of Naturalization,'" and a "congressional

---

[9] *Graham* involved a Pennsylvania law that denied public assistance to legal residents and an Arizona law that denied federally subsidized benefits to legal residents who had not lived within the United States for fifteen years.

[10] The *Graham* Court noted that *Takahashi v. Fish & Game Commission* established the equal-protection rights of aliens. *Id.* at 382.

enactment construed so as to permit state legislatures to adopt divergent laws on the subject of citizenship requirements for federally supported welfare programs would appear to contravene this explicit constitutional requirement of uniformity." *Id.*; *see also Mathews*, 426 U.S. at 81 (holding that Congress's broad power over naturalization and immigration encompasses the power to condition an alien's eligibility for participation in a federal medical insurance program). A state "has no power to interfere," *Nyquist v. Mauclet*, 432 U.S. 1, 10 (1977), with the exercise of Congress's authority to "establish[ ] rules and regulations touching the rights [and] privileges …of aliens." *Hines*, 312 U.S. at 62–63. It is a "plenary federal power" in which the "States do not share." *Bruns*, 750 F.3d at 66 (citations omitted); *see also Puerto Rico v. Branstad*, 483 U.S. 219, 228 (1987) (noting that the Tenth Amendment's reservation of state power does not supersede duties "imposed upon the States by the Constitution itself").

After *Graham,* the Supreme Court "has repeatedly struck down an array of state statutes denying [lawfully present] aliens equal access to licenses, employment, or state benefits," *Korab*, 797 F.3d at 578 (citations omitted), "[i]n each case . . . reasserting its commitment to [*Graham's*] holding." *Dandamudi v. Tisch*, 686 F.3d 66, 73 (2d Cir. 2012) (holding that a statute's requirement that an applicant for a pharmacist's license be either a United States citizen or an alien lawfully admitted for permanent residence in the United States violated the Equal Protection and Supremacy Clauses of the United States Constitution).

Congress has declared immigrant self-sufficiency to be an element of national immigration policy, 8 U.S.C. § 1601(1), (2), and to promote that goal it exercised its authority under the Naturalization Clause to enact the Welfare Reform Act which governs the extent to which aliens may have access to the public benefits that are available to United States citizens. *See Korab*, 797 F.3d at 580. The Welfare Reform Act includes the directive that participating states must furnish Medicaid benefits to refugees for the first seven years following their arrival

in this country. 8 U.S.C. §§ 1612(b)(1), (2)(A)(i), 1613(b)(1). Thus, instead of "commandeering" state funds to support health-care coverage for refugees, the Welfare Reform Act permits Tennessee to reduce expenditures that it would otherwise be required to make.

A state's obligation under the Medicaid Act to cover lawfully present aliens predates and arises independently of the Refugee Act. *See* 45 C.F.R. § 248.50 (1973). If the Refugee Resettlement Program were repealed, states participating in the Medicaid program would still be obligated to provide coverage to refugees to the extent required by the Welfare Reform Act. And, as pointed out by Defendants, under *Graham*, the State would be compelled to continue covering health-care services for refugees for so long as they continued to meet all other eligibility requirements. "A duty imposed on states by the Constitution can hardly be said to violate the Tenth Amendment's reservation of unenumerated powers to the states." *Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997) (citing *Puerto Rico v. Branstad*). Accordingly, Plaintiffs have not alleged a cognizable claim of violation of the Tenth Amendment or the Spending Clause.

To the extent that Plaintiffs have attempted to rely on *County of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1201 (N.D. Cal. 2017), in support of their argument, this case is inapposite.[11] In that case, the court looked at President Donald J. Trump's Executive Order which threatened to deny federal money to and take enforcement action against an undefined group of so-called "sanctuary jurisdictions." The court issued a permanent injunction barring enforcement of the Executive Order on the ground that it violated numerous constitutional safeguards, including separation of powers. In the order, the court noted that the "Constitution vests the spending powers in Congress, not the President, so the Executive Order cannot

---

[11] As mentioned in footnote one, Plaintiffs submitted this case as "supplemental authority" post-briefing. (ECF No. 44.) However, Plaintiffs have made no arguments or analysis concerning the case as to how it supports their position.

constitutionally place new conditions on federal funds." *Id.* at 1202. The present case involves a Congressional act as opposed to an executive order, and no separation of powers issue is implicated.

Plaintiffs also attempt to rely on *Printz v. United States*, 521 U.S. 898 (1997), which considered the constitutionality of the Brady Handgun Violence Prevention Act, 18 U.S.C. § 922, a federal law requiring state and local law enforcement officers to conduct background checks and perform other tasks related to gun sales. The Court held that the Act violated the residual sovereignty of the states by imposing an unconditional legal obligation on state law enforcement officials to conduct background checks on prospective handgun purchasers. *Id.* at 933–34. "The Federal Government . . . may not compel the States to enact or administer a federal regulatory program." *Id.* at 933 (citation omitted); *see also Cutter v. Wilkinson*, 423 F.3d 579, 589 (6th Cir. 2005) ("Together *New York* [*v. United States*, 505 U.S. 144 (1992)] and *Printz* stand for the unexceptionable proposition that Congress cannot force the states to enact or administer a federal regulatory scheme."). However, states can enter into voluntary contracts with the federal government whereby they agree to legislate according to federal terms in exchange for some federal benefit or forbearance, *New York*, 505 U.S. at 166–67, as in the present case.

Finally, Plaintiffs contend that the threatened loss of federal Medicaid funding to coerce support of the federal refugee program is not constitutional under *National Federation of Independent Business v. Sebelius* ("*NFIB*"). In *NFIB*, the Supreme Court examined the constitutionality of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (the "ACA"). As originally drafted, the ACA provided substantial federal funds to states to expand their Medicaid programs, but, if states chose not to accept the additional funds, they would not only forgo those funds but lose all existing federal funds as well. In a

plurality opinion,[12] the Court found that this provision of the ACA was not a valid exercise of Congress's spending power because it would coerce states to either accept the expansion or risk losing existing Medicaid funding.[13] 567 U.S. at 671–678.

In reaching this decision, the plurality emphasized that decisions of the Court had "repeatedly characterized . . . Spending Clause legislation as 'much in the nature of a contract.'" *Id.* at 576–776 (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)). As such, states cannot freely accept funds when they are coerced into doing so by lopsided terms of the grant. *Id*. at 577. After a discussion of Federalism principles, the plurality stated:

> We have upheld Congress's authority to condition the receipt of funds on the States' complying with restrictions on the use of those funds, because that is the means by which Congress ensures that the funds are spent according to its view of the "general Welfare." Conditions that do not here govern the use of the funds, however, cannot be justified on that basis.

*Id.* at 585.

While Congress has "authority to condition the receipt of funds on the States' complying with restrictions on the use of those funds," *id.*, the plurality viewed the ACA as tying traditional Medicaid grants, not to compliance with restrictions on their use, but to implementing the expansion and, therefore, "pressur[ed] the States to accept policy changes." *Id.* at 580. The threatened loss of all Medicaid grants "pass[ed] the point at which pressure turns into compulsion," leaving states "with no real option but to acquiesce" in the expansion. *Id.* at 582. The plurality emphasized that the expansion could not be considered merely an adjustment to the

---

[12] Seven Justices concluded that taking away existing Medicaid funding from states which declined to sign up for the new expanded Medicaid program was unconstitutional but were unable to agree on a single rationale. Chief Justice John Roberts, in a plurality opinion joined by Justice Stephen Breyer and Justice Elena Kagan, offered one rationale for that holding. A joint dissent by Justice Antonin Scalia, Justice Anthony Kennedy, Justice Clarence Thomas, and Justice Samuel Alito offered another.

[13] The Court's decision on the other portions of the ACA that were challenged in *NFIB* is not pertinent to this case.

existing program that Congress was entitled to make as it evolved. That is, the conditions the ACA imposed on the states did not "govern the use of" the new funds granted to the states but, instead, took "the form of threats to terminate other significant independent grants" already in existence. *Id.* at 580. Thus, the expansion was "in reality a new program," a transformation of Medicaid from a health-care program for the indigent into a health-insurance program for a significant portion of the non-elderly population – a change that the states could not have anticipated. *Id.* at 582-83. Chief Justice Roberts explained that the expansion

> accomplishe[d] a shift in kind, not merely degree. The original program was designed to cover medical services for four particular categories of the needy: the disabled, the blind, the elderly, and needy families with dependent children.... Previous amendments to Medicaid eligibility merely altered and expanded the boundaries of these categories. Under the [ACA], Medicaid ... is no longer a program to care for the neediest among us, but rather an element of a comprehensive national plan to provide universal health insurance coverage.

*Id.*[14]

In contrast, the refugee-coverage provision of the Welfare Reform Act does not condition the states' receipt of federal Medicaid funds on their implementation of an entirely new program. *Graham v. Richardson* announced the states' obligation to extend Medicaid coverage to lawfully

---

[14] The plurality found a Spending Clause violation because it determined that the Medicaid program expansion was a new program, participation in which was a condition for continued receipt of pre-ACA Medicaid funds and because the loss of pre-ACA Medicaid funds would have been so consequential to the states that states had no real option to refuse. Thus, the expansion placed a condition on the receipt of funds that did not govern the use of those funds, and the condition was unduly coercive. While the joint dissent would have held the expansion provision unconstitutional based on the plurality's analysis, they took the coercion analysis a step further and would have invalidated the expansion based on a finding of coercion alone. Because the plurality's rationale was narrower, it is considered to be the holding of the Court. *See Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted) (deciding that, when a majority of the Supreme Court agrees on a result but "no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds'").

present aliens in 1971; the Secretary codified that obligation by regulation in 1973; and Congress ratified the Secretary's decision when it passed the Omnibus Budget Reconciliation Act of 1986, ten years before the Welfare Reform Act. For decades Tennessee has accepted federal Medicaid funds based on the understanding that it must cover lawfully present aliens under its Medicaid program. The refugee coverage provision narrowed rather than expanded that requirement by placing a time limit on the states' obligation to expend state funds on health-care services for refugees.

Plaintiffs contend that, despite its longevity, changed conditions and modifications to the Refugee Resettlement Program have transformed it into a new program that Tennessee could not have foreseen. According to Plaintiffs, Tennessee's participation in the Medicaid program predates the advent of the refugee resettlement program in 1980 as well as the elimination of federal funding for the program in 1991. They argue that changes in the refugee resettlement program have resulted in a radically different program than originally intended. Plaintiffs claim to have been surprised by the fact that the Federal Government did not honor Tennessee's decision to withdraw from the program in 2007 but instead continued it by using federal contractors while increasing the overall number of refugees. They characterize these changes as ones Tennessee could not have anticipated and that caused a "shift in kind, not merely degree" as was found to be unconstitutional in *NFIB*.

Despite Plaintiffs' arguments, this Court finds that the requirement of providing state funding for refugees in exchange for federal Medicaid funds cannot be considered "new" as was the ACA expansion provision in *NFIB*. In *NFIB*, "the condition at issue was 'new' in two senses of the word: [the condition] had been recently enacted at the time of the litigation, and [the condition] imposed additional requirements with which States had to comply to continue receiving preexisting federal funding." *Miss. Comm'n on Envtl. Quality v. E.P.A.*, 790 F.3d 138,

179 (D.C. Cir. 2015).  As explained above, the requirement to provide Medicaid to refugees is long standing rather than being recently enacted at the time of this litigation.  Additionally, no additional requirements have been imposed on Tennessee in order for it to receive preexisting federal funding.

Moreover, there is no federal requirement that a state participate in the refugee program in order for that state to be required to provide benefits to refugees.  The Federal Government's practice of relying on private non-profit organizations to administer refugee resettlement in states that elect to discontinue participation in the refugee program under "Wilson/Fish" programs was established by at least 1999.

Plaintiffs cannot now claim to be surprised by the cessation of reimbursement for the cost of providing Medicaid coverage to refugees since Congress ceased to appropriate funds for that purpose in 1991, a fact acknowledged in the complaint.[15]  Despite the lack of reimbursement, the State has continued to participate in the Medicaid program.

Finally, Plaintiffs maintain that the growing number of refugees admitted in recent years has increased the cost of refugee health-care to the states and was not anticipated at the time Tennessee entered into the program.  To the contrary, as pointed out by Defendants, periodic international humanitarian crises accompanied by refugees seeking to resettle in the United States has always been foreseeable.  Under the Refugee Act of 1980, "the number of refugees who may be admitted" each year is not fixed or determined according to a prescribed formula, but "shall be such number as the President determines, before the beginning of the fiscal year … is justified by humanitarian concerns or is otherwise in the national interest." 8 U.S.C. § 1157(a)(2).  The President may also admit additional numbers of refugees as needed to meet

---

[15]  "Federal funds initially supported the federal government's refugee resettlement program, but eventually federal reimbursements to the states were reduced and, by 1991, eliminated entirely. States thereby became responsible for costs of the program." (Compl. ¶ 27).

"unforeseen emergency refugee situation[s]." *Id.* § 1157(b). Given the history of recurrent refugee crises and the purpose of the Refugee Act, variation in the numbers of annual refugee admissions are to be expected.

None of the events described by Plaintiffs represents a departure from the understanding pursuant to which Tennessee has accepted Federal Medicaid funds for over forty years – that it must cover lawfully present aliens, including refugees, under its Medicaid program. Therefore, Plaintiffs have not shown that the requirement that Tennessee provide Medicaid coverage for refugees for seven years is a new program within the ambit of *NFIB*.

Plaintiffs also contend that the amount of federal Medicaid funds Tennessee might lose if they do not comply with the requirement to provide Medicaid to refugees is so large that they have no choice but to continue with the program. The *NFIB* Court looked at the amount of funding at stake for the states in deciding that the expanded Medicaid program under the ACA was unconstitutionally coercive. Chief Justice Roberts noted that "the financial 'inducement' Congress has chosen is much more than 'relatively mild encouragement' – it is a gun to the head," *NFIB*, U.S. at 581; however, the Court did not specify a point at which financial inducement becomes coercion. Instead, the Court commented that *Steward Machine Co.* did not attempt to fix a line at which persuasion gives way to coercion, and the *NFIB* Court declined to do so as well. "It is enough for today that wherever that line may be, this statute is surely beyond it." *Id.* at 585.

While Tennessee could potentially lose all of its federal Medicaid funds, the Federal Government could withhold only part of the State's federal Medicaid funding.[16] At this juncture,

---

[16] The Complaint alleges that "[f]rom 2008, when Tennessee withdrew from the refugee resettlement program, until 2016, the federal contribution to Medicaid ranged from over $4 billion ($4,566,651,300.00) to nearly $7 billion and has represented 17% to 21% of Tennessee's budget." (Compl. ¶ 35.)

this Court cannot ascertain what amount the State is faced with losing. Although inherent in Medicaid's provisions for the process of amending a state's Medicaid plan is the possibility that the Federal Government might deny a proposed amendment and withhold all or part of the funding, there is no allegation the Federal Government has made such a threat to Tennessee. This case does not present the situation in *NFIB* in which, in exchange for new conditions to a federal program, Congress not only offered states additional money but also threatened to stop providing the funding it currently distributed for that program if those conditions were not accepted.

Moreover, the amount of the loss of funding is only one element of the coercion test adopted by the *NFIB* plurality. The State must also show that Congress has created a new condition that is different from the original program Congress is purporting to modify and is using that program's funding as leverage to force the states to accept the new condition. *NFIB*, 567 U.S. at 583-84. As discussed above, Plaintiffs have failed to make this showing and, therefore, have failed to state a claim upon which relief may be granted.

For these reasons, Defendants' motion to dismiss is **GRANTED**, and judgment will be entered in favor of Defendants.

**IT IS SO ORDERED.**

s/ **S. Thomas Anderson**
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date: March 19, 2018